IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 7, 2017

## GARY HAWKINS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 11-05793          W. Mark Ward, Judge**

_____

### No. W2016-00723-CCA-R3-PC

_____

The Petitioner, Gary Hawkins, appeals the denial of his petition for post-conviction relief by the Shelby County Criminal Court. On appeal, he argues that trial counsel was ineffective for (1) failing to object to testimony regarding an alleged prior bad act by the Petitioner and (2) failing to object to improper statements made during the State's closing argument. Additionally, he asserts that the cumulative errors made by trial counsel entitle him to relief. After review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and J. ROSS DYER, JJ., joined.

Joshua B. Dougan, Jackson, Tennessee, for the Petitioner, Gary Hawkins.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Greg Gilbert, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

A Shelby County jury convicted the Petitioner of first degree felony murder in the perpetration of aggravated child neglect and aggravated child neglect. The Petitioner received a life sentence for the first degree murder conviction and a concurrent twenty-two year sentence for the aggravated child neglect conviction. State v. Gary Hawkins, W2012-02185-CCA-R3-CD, 2014 WL 1571810, at *1 (Tenn. Crim. App. Apr. 17, 2014) perm. app. denied (Tenn. Sep. 24, 2014). The facts underlying the Petitioner's convictions are as follows:

The victim in this case, S.I., was the 18-month-old daughter of Shamira Ivory, who lived with Defendant at the time of S.I.'s death. Shamira Ivory was pregnant with S.I. when she moved to Memphis from Atlanta in December, 2006. Ms. Ivory testified that while living in Georgia, she gave birth to a son who was removed from her custody at the age of six months due to Ms. Ivory's lack of stability and mental health issues. Ms. Ivory had "two or three" more children removed from her custody at birth. She testified that she moved to Memphis before S.I.'s birth so that the baby would not be taken by authorities. When Ms. Ivory first moved to Memphis, she lived with her mother, Mary Richardson. She then moved in with a cousin for three months. S.I. was born on February 19, 2007, while Ms. Ivory was living with her cousin. Ms. Ivory later lived with a man named Bobby Torrence for a year. She testified that during that time, S.I. was healthy except for an ear infection and that she received regular "well baby" examinations. Ms. Ivory missed an appointment, however, for Ivory to be examined for "low weight gain." Ms. Ivory and Torrence separated, and she moved in with Tyrone McNeil, by whom she became pregnant. Ms. Ivory subsequently left McNeil and was homeless until she moved into a home owned by her adoptive mother, Vera Corley. Ms. Ivory and S.I. lived there with Ms. Corley's son and daughter. Defendant also lived there and slept on the couch. Ms. Corley's son and daughter moved out of the house in early September.

Ms. Ivory and Defendant began a relationship after she moved into the house. Ms. Ivory testified about an incident when she and Defendant were having sex while S.I. was on the bed with them. S.I. touched Defendant and Defendant "said it felt good to him." Ms. Ivory did not tell police about the incident because she was afraid of losing custody of S.I. Ms. Ivory testified about another incident when Defendant kicked Ms. Ivory in the stomach while she was pregnant because he wanted her to get off the couch. On another occasion, Ms. Ivory came home and Defendant "grabbed [her] and smelled [her] private part" because Defendant "thought [Ivory] had been sleeping with Big Homey [Ralphael Harris]."

On September 17, 2008, S.I. was fine when she woke up that morning. Ms. Ivory stayed in the bedroom while Defendant fed S.I. Mexican food. S.I. then went to the bedroom and stayed with Ms. Ivory until 8:00 p.m. When they got up, Ms. Ivory made pancakes and fed S.I. at the dining room table. She testified that S.I. ate well, was playing, and had no bruises on her stomach. At around 9:00 p.m., Ms. Ivory left S.I. with Defendant, while Ms. Ivory went to a store to buy cigarettes. Ms. Ivory's friend, Ralphael

"Big Homey" Harris, drove her to the store. She testified that she was gone for approximately 10 to 15 minutes. Ms. Ivory told police that S.I. was "screaming and hollering" when she left to go to the store. She testified that S.I. was "spoiled" and always cried when Ms. Ivory left her.

Ms. Ivory testified that when she returned home from buying cigarettes, she saw S.I. lying on the couch "covered in throw up." Defendant was sitting on the other couch, and he told her the baby had vomited. Ms. Ivory got a towel to clean S.I. She saw two small bruises on S.I.'s stomach. Ms. Ivory left the house again and walked to Walgreen's to buy Sprite and Pedialyte. She testified that she "was worried but [S.I.] usually throws up anyway. She has a problem with that anyway." Ms. Ivory thought S.I. had a stomachache. When she returned from the store, she tried to give S.I. the Pedialyte, but S.I. would not swallow. S.I.'s eyes were rolling back in her head, and her head was moving back and forth. S.I. was unresponsive when Ms. Ivory splashed water on her face and rubbed ice on her forehead. Ms. Ivory called Ms. Corley, who told her to call 911. Ms. Ivory testified that Defendant also told her to call 911, but Defendant did not seem very concerned. Ms. Ivory called 911, and Defendant left when they heard sirens

. . . .

Paramedics responded to a call made at 11:29 p.m. They found S.I. lying on her back on a couch, and she was unresponsive, had no pulse, and was not breathing. They began resuscitation. S.I. remained unresponsive. Paramedic Patrick McDevitt observed that S.I.'s abdomen was distended and bruised. Ms. Ivory told McDevitt that those "spots" had just come up. Paramedics transported S.I. to the hospital. Dr. James Anderson O'Donnel, II, testified that S.I. arrived at the emergency room "in full cardio pulmonary arrest" and was receiving chest compressions and being ventilated. Dr. O'Donnell administered several doses of epinephrine to try to restart S.I.'s heart, but was unsuccessful. Shortly after midnight, Dr. O'Donnell stopped resuscitation efforts.

Ms. Ivory told investigators that she went to the store and returned home to find S.I. not feeling well. She stated that she then went to Walgreens to buy Sprite and Pedialyte, and that she left S.I. home with Defendant both times. Ms. Ivory gave investigators her receipt from Walgreens. Investigators also interviewed Ralphael Harris, who stated that he picked up Ms. Ivory at her house and drove her to the store to buy cigarettes. Sergeant Joseph Peel

reviewed "about four hours worth of video" from the store, but did not see Ms. Ivory or Harris enter the store. Sergeant Peel also reviewed video from Walgreens that confirmed that Ms. Ivory entered the store at 10:07 p.m. and purchased Pedialyte and Sprite 14 minutes later. The Walgreens store was located a third of a mile from Ms. Ivory's house.

. . . .

Ms. Frazier testified that a mutual friend, Kristina Owens, called her around 6:00 a.m. on September 18, and told her that Ms. Ivory was at Ms. Owens' house and the "baby had got killed." Frazier and Owens arranged a three-way call with Ms. Ivory, and Ms. Ivory stated that "she was scared and she was trying to get some money so she can go out of town." Frazier then called the police and reported that Ms. Ivory planned to leave town. Frazier denied telling Lieutenant Crow that she saw Ms. Ivory abuse S.I., but she acknowledged that she told him Ms. Ivory had five other children who were taken from her custody. Frazier also denied telling Lieutenant Crow that Ms. Ivory had admitted killing the baby. About an hour after Frazier called, police picked her up, and she directed them to the house where Ms. Ivory was located.

. . . .

Dr. Karen Elizabeth Chancellor, Chief Medical Examiner for Shelby County, performed an autopsy on the victim. Dr. Chancellor testified that at the time of her death, S.I. weighed 21 pounds and was 21 inches in length. Dr. Chancellor testified that S.I. was "small for her age" and that she was "in the lower fifth percentile" of children her age for weight and height. Dr. Chancellor observed scars and healing scratches on S.I.'s head, arm, and abdomen. Dr. Chancellor observed multiple bruises on S.I.'s abdomen and chest. There were also bruises on both lungs and blood in her abdominal cavity and chest cavity. There were multiple tears of the small intestine. Dr. Chancellor observed discoloration on the left side of S.I.'s forehead. An internal examination revealed that there was an area of hemorrhaging to the deep scalp tissue, causing the discoloration. Dr. Chancellor found bruises on the internal tissue in S.I.'s thighs that were not visible externally on her skin. Dr. Chancellor determined that S.I.'s injuries were caused by blunt force trauma as a result of multiple impacts. Dr. Chancellor opined that S.I. received "at least ten blows to the abdomen and there were separate blows to the chest[, thighs, wrist, and head.]" Dr.

- 4 -

Chancellor testified that the bruises on the victim's body appeared to be recent. Dr. Chancellor determined that the manner of death was homicide.

Gary Hawkins, 2014 WL 1571810, at *1.

The Petitioner filed a direct appeal challenging the sufficiency of the evidence and argued that the trial court erred by allowing evidence of a prior conviction for child abuse into evidence. Id. This court found that the evidence was sufficient to sustain his convictions, and concluded that even though the trial court erred by allowing evidence of the Petitioner's prior conviction, this error was harmless. Id. at *9-12. The Tennessee Supreme Court denied permission to appeal. Id. at *1. On May 21, 2015, the Petitioner filed a pro se petition for post-conviction relief alleging several grounds of ineffective assistance of counsel. On June 1, 2015, the Petitioner was appointed counsel who filed an amended petition, which incorporated the Petitioner's pro se petition and raised new grounds for relief. The State filed a response to the Petitioner's allegations on November 25, 2015.

**Post-Conviction Hearing**. At the March 3, 2016 post-conviction hearing, trial counsel testified that he represented the Petitioner during his trial and on appeal. During the Petitioner's trial, trial counsel remembered that the Petitioner's co-defendant testified about "some inappropriate contact" between the Petitioner and the victim. Specifically, the co-defendant was asked "What did you and [the Petitioner] fight over," and her response was that while she and the Petitioner were having sex, the victim touched the Petitioner on his "balls" and the Petitioner said "it felt good to him." Trial counsel acknowledged that he did not object to this testimony, and he was unaware that the co-defendant would provide this testimony at trial. Trial counsel stated that he had filed a motion in limine to prevent any testimony regarding prior child abuse by the Petitioner, but he was unaware that the co-defendant would testify about this incident. When asked whether it was a strategic decision not to object to the co-defendant's testimony, trial counsel explained that he believed the co-defendant was not a credible witness and that her testimony was not "bad" for the Petitioner.

He explained that his defense theory was that the co-defendant was lying to the police about the Petitioner's involvement and "made up . . . stories to protect herself" and that she was the person responsible for the victim's death. Trial counsel testified that his plan was to "come back around and cross-examine her on why she didn't tell the police this story." Trial counsel testified that he only had "split second" to decide whether to object and that he made the "choice to see where it went." He clarified that the co-defendant's testimony "was a problem," but he chose to not "draw attention" to her testimony by objecting. Trial counsel believed that he cross-examined the co-defendant about her statement and "attempted to impeach her." Trial counsel stated that he waived

any issues with the co-defendant's statement on appeal because he did not object to the statement at trial.

Next, post-conviction counsel read an excerpt of the State's closing argument, which included the following remark: "[The Petitioner] is guilty. There is no question about that, we don't need to argue about that and frankly that is not why we are here." Post-conviction counsel asked trial counsel if it was "some kind of strategy" not to object to the State characterizing the Petitioner as "guilty." Trial counsel testified that, at the time, "it was very difficult . . . to make those contemporaneous objections at the trial level" because an objection would not be "supported at either the trial level, or the Court of Criminal Appeals level." Because he thought an objection would not be successful at trial and that he would not be successful on appeal, he chose not to object to the State's remarks. However, trial counsel stated that he would treat such comments differently today because there is additional case law to allow defense attorney's to object to such comments during closing argument.

On cross-examination, trial counsel reiterated that the co-defendant's testimony regarding the "inappropriate contact" between the victim and the Petitioner was a complete surprise to trial counsel, and he was not expecting her to provide such testimony. Trial counsel explained that he had to "quickly balance" whether there was some way he could use this statement to his advantage during cross-examination or object to the statement and ultimately decided to cross-examine the co-defendant about this testimony. With regards to the State's remark during closing argument that the Petitioner was "guilty," trial counsel stated that this remark was close to being "objectionable" and that it "was discomforting when it was said."

On redirect examination, post-conviction counsel read another portion of the State's closing argument, which included the following remark: "[The Petitioner] is the . . . same kind of guy that would say, not my baby, not my problem, the same kind of cold blooded guy that would punch a little girl, that's about this tall and weighs about twenty-one pounds in the abdomen, time and time again." Post-conviction counsel asked if trial counsel would object to such a remark today, and trial counsel's response seemed to imply that this court would "not do anything about the argument," but he did not provide a reason for failing to raise an objection.

The Petitioner testified that he had reviewed his petition for post-conviction relief with post-conviction counsel, but the Petitioner stated that he did not want to testify about any of the grounds raised in his petition.

The post-conviction court took the matter under advisement, and on March 3, 2016, the court issued a written order denying relief. The post-conviction court

concluded that trial counsel made a strategic decision not to object to the co-defendant's testimony regarding the "inappropriate contact" between the Petitioner and the victim, and the State's remarks during closing argument.[1] The post-conviction court also noted that trial counsel was not asked "why" he failed to object to any portion of the closing argument. The court found that "[t]he decisions of a trial attorney as to whether to object to opposing counsel's arguments are often primarily tactical decisions." The post-conviction court determined that the Petitioner failed to established deficient performance or prejudice, and also noted that "since the[se] matters were not properly contested at the time of trial, they would have been deemed 'waived' for purposes of appellate review . . . Counsel pursued his strongest issues in the direct appeal." It is from this order that the Petitioner now timely appeals.

## ANALYSIS

On appeal, the Petitioner argues that trial counsel was ineffective for failing to object to inadmissible testimony during trial and that trial counsel failed to object to the State's improper remarks during closing argument. The Petitioner further contends that trial counsel's cumulative errors were prejudicial and entitle him to relief. The State responds that the Petitioner received effective assistance of counsel and that the cumulative error doctrine does not entitle the Petitioner to relief. Upon review, we agree with the State.

We begin our review of these issues by acknowledging that post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103. The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

---

[1] The Petitioner raised two additional arguments in his petition for post-conviction relief. However, a footnote in the Petitioner's brief states, "[b]ased on the record on appeal, including the testimony elicited during the post-conviction evidentiary hearing, Appellant chooses not to address grounds (3) and (4) in this brief." The post-conviction court addressed all of the Petitioner's issues in its order denying relief; however, this opinion will focus solely on the two issues addressed in the Petitioner's brief.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal citations and quotation marks omitted); Frazier v. State, 303 S.W.3d 674, 679 (Tenn. 2010); see Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011). A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

In Vaughn, the Tennessee Supreme Court repeated well-settled principles applicable to claims of ineffective assistance of counsel:

> The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

Vaughn, 202 S.W.3d at 116 (internal quotations and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Id. (citing Strickland v. Washington, 466 U.S. 668, 687 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694). In order to satisfy the "prejudice" requirement in the context of a guilty plea, the petitioner must show that, but

for counsel's errors, he would not have entered his guilty plea and would have proceeded to trial. Serrano v. State, 133 S.W.3d 599, 605 (Tenn. 2004) (citing Hill v. Lockhart, 474 U.S. 52, 59 (1985)).

We note that "[i]n evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999) (citing Strickland, 466 U.S. at 689). Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89. However, we note that this "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369).

The Petitioner argues that trial counsel was ineffective for failing to object to inadmissible testimony from his co-defendant, the victim's mother. He asserts that trial counsel allowed the co-defendant to testify about an alleged incident where the victim touched the Petitioner's "balls", and he said "it felt good to him." The Petitioner further contends that this evidence was "both wholly irrelevant and highly prejudicial to [the] Petitioner," and trial counsel's failure to object "contributed to the State's ability to impugn [the] Petitioner's character in a manner not allowed by Tennessee [l]aw." The State responds that trial counsel's decision was strategic and that trial counsel provided effective assistance of counsel. We agree with the State.

At the post-conviction hearing, trial counsel testified that he decided not to object to this testimony and instead cross-examined the co-defendant about this incident. He further testified that he did not want to "draw attention" to the statement by objecting and decided that a thorough cross-examination was the appropriate decision. It is well established that this court will not "second guess' tactical and strategic choices pertaining to defense matters or to measure a defense attorney's representation by '20-20 hindsight.'" Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997) (quoting Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)). The post-conviction court concluded that trial counsel's decision was strategic and that trial counsel's performance was not deficient. We agree, and conclude that the record shows that trial counsel made a well-informed and reasoned decision under the circumstances not to object to the testimony at issue. The Petitioner has failed to establish either deficient performance or prejudice resulting therefrom. He is not entitled to relief.

Next, the Petitioner argues that trial counsel was ineffective for failing to object to the State's remarks during closing argument. The Petitioner contends that trial counsel

should have objected to the following remarks: (1) "[The Petitioner's] guilty. There's no question about that. We don't need to argue about that, and frankly that's not why we're here. . . ." and (2) "[The Petitioner] is the same kind of guy, the same kind of guy that would say, not my baby, not my problem, the same kind of cold blooded guy that would punch a little girl, that's about this tall and weighs about twenty-one pounds in the abdomen, time and time again." Later, during its rebuttal, the Petitioner claims the State argued that the jury "should disregard impeaching evidence of a critical witness," and the jury should return a guilty verdict because they were "good community members." The Petitioner asserts that the "collective impact of these statements prejudicially undermined the fundamental fairness of [the Petitioner's] trial." The State contends that trial counsel reasonably decided not to object during the State's closing argument and that the Petitioner failed to established that trial counsel was ineffective. We agree with the State

The Tennessee Supreme Court has stated that closing argument is a "valuable privilege that should not be unduly restricted." Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001) (citing State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978) (citation omitted)). As a result, attorneys have considerable leeway in arguing their positions during closing argument. Id. The closing argument, however, "must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried." Russell v. State, 532 S.W.2d 268, 271 (Tenn. 1976). Furthermore, "the reviewing court must indulge a strong presumption that the [counsel's] conduct falls within the range of reasonable professional assistance and may not second-guess the tactical and strategic choices made by counsel unless those choices were uninformed by inadequate preparation." Gregory Paul Lance v. State, No. M2005-01765-CCA-R3-PC, 2006 WL 2380619, at *6 (Tenn. Crim. App. Aug. 16, 2006) (internal citations omitted).

In denying relief, the post-conviction court concluded that trial counsel made a strategic decision not to object and that the Petitioner offered no evidence as to "why" trial counsel failed to object. See Robby Lynn Davidson v. State, No. M2005-02270-CCA-R3-PC, 2006 WL 3497997, at *7 (Tenn. Crim. App. Dec. 4, 2006) (concluding that "[t]he decisions of a trial attorney as to whether to object to opposing counsel's arguments are often primarily tactical decisions."). Citing State v. Sexton, 386 S.W.3d 371, 429 (Tenn. 2012), the post-conviction court found that "without testimony from trial counsel as to 'why' he chose not to object to a statement, the court must assume it was a valid tactical decision."

The Petitioner raised several issues with the State's closing argument, but during the post-conviction hearing, trial counsel was only questioned about one specific portion of the State's closing argument. Post-conviction counsel asked trial counsel if it was "part of some kind of strategy to let [the State] say that [the Petitioner] is guilty," and trial counsel responded that the State was typically allowed to make such comments during

- 10 -

closing, and an objection would have been unsuccessful. Moreover, trial counsel testified that this remark was "close" to being "objectionable," but ultimately decided not to object. The post-conviction court concluded, and we agree, that trial counsel made a strategic decision not to object. See Henley, 960 S.W.2d at 579 (quoting Hellard, 629 S.W.2d at 9). The Petitioner is not entitled to relief.

The Petitioner also argues that trial counsel should have objected when the State referred to the Petitioner as a "cold blooded guy that would punch a little girl, that's about this tall and weighs about twenty-one pounds in the abdomen, time and time again." The Petitioner also claims that the State's remarks on rebuttal were improper and trial counsel was ineffective for failing to object. The Petitioner argues that this statement was an "improper disparagement of [the] Petitioner's character." However, at the post-conviction hearing, trial counsel's response was vague and did not provide a clear explanation for his decision not to object. Moreover, there is no testimony from trial counsel explaining why he did not object to the State's remarks during its rebuttal. Based on the record before us, we cannot conclude that trial counsel was deficient. See State v. Sexton, No. M2004-03076-CCA-R3-CD, 2007 WL 92352, at *5 (Tenn. Crim. App. Jan. 12, 2007). The burden was on the Petitioner to establish trial counsel's deficient performance, and the Petitioner failed to meet that burden. We agree with the post-conviction court's conclusion that "without testimony from trial counsel as to 'why' he chose not to object to a statement, the court must assume it was a valid tactical decision." Accordingly, he is not entitled to relief.

Finally, the Petitioner argues that the cumulative effect of trial counsel's errors entitles him to relief because it is "reasonably probable that [the] Petitioner's trial and direct appeal could have had a significantly different outcome." The cumulative error doctrine recognizes that in some cases there may be multiple errors committed during the trial proceedings, which standing alone constitute harmless error; however, considered in the aggregate, these errors undermined the fairness of the trial and require a reversal. State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). However, the cumulative error doctrine properly applies only where there has been more than one actual error. Id.; See also, Tracy F. Leonard v. State, No. M2006-00654-CCA-R3-PC, 2007 WL 1946662, at *21 (Tenn. Crim. App. Sept. 13, 2007) ("[A] Petitioner who has failed to show that he received constitutionally deficient representation on any single issue may not successfully claim that his constitutional right to counsel was violated by the cumulative effect of such counsel's errors."). Because the Petitioner has failed to prove deficient representation on any issue, he cannot successfully claim that the cumulative effect of counsel's performance violated his constitutional rights. The Petitioner is not entitled to relief.

## CONCLUSION

- 11 -

Based on the above reasoning and authorities, we affirm the judgment of the post-conviction court.

_____

CAMILLE R. McMULLEN, JUDGE